Your Honor, the second case of the morning, Fall 209-1178, Tassall v. F. Hall v. Scott Glaser v. Payne Specialists of Greater Chicago, SC. On behalf of the Appalachians, Mr. Michael Ratzak. On behalf of the Appalachians, Mr. Scott Howley. Mr. Ratzak. Good morning, Your Honor. My name is Michael Ratzak. I'm here on behalf of the plaintiffs' appellants in this case. Those would be the three surviving members of the Passow family, Bruce and Monica and Jennifer. Of course, this is the case in which Deborah Passow passed away after some surgery. The case went to trial. The jury came back with a finding of liability, awarded various damages. But the difficulty and the reason we are here is that the jury awarded zero for loss of society. And the difficulty or the problem or the deficiency in that failure to award anything at all is that it runs completely afoul of all of the unreported evidence. And it runs afoul of presumption of damages for loss of society that's present in the Bullard case from the Supreme Court from years ago. Mr. Ratzak, this was a jury case, correct? It was, Your Honor. And the jury listened to the witnesses and we presume that they made the decision concerning credibility. If we come to that conclusion or if reading this record we come to that conclusion, wasn't there evidence from the remaining parties of the Passow family or the extended Passow family that there had been over periods of time difficulties, estrangements, counseling and things? Should the jury have ignored that and only looked at the last six months of Mrs. Passow's life? I mean, what's the position here? Actually, I have a twofold answer to that. And the way Your Honor phrased it is exactly what I was going to get to. If there had been some, if I could just assume, there was some dramatic altercation between the mother and the daughters years and years ago, I don't believe that that would be evidence of what was lost today. The loss of society that you have is the loss that you incurred at the time of the death. It would focus on the relationship at some reasonable time before death. The fact that something happened a long time ago, I don't know that that could ever actually come into play. But more importantly and more to the point of Your Honor's question is the only evidence to contradict, that might possibly contradict this dramatic discussion by all of the witnesses of what the loss of their wife and mom meant, were such picayune minor things that our position is the jury could never rely upon those to say there was no loss of society, that there was zero relationship at the time of the death of Mrs. Passow. Are you asking us though, as you know, there's a doctrine of law that says we cannot substitute our judgment for that of the jury. Exactly. So wouldn't we be running afoul of that principle of me, in essence you're asking us when you think about it, to re-weigh the evidence? No, we're not asking the court to do that because our position is that there isn't sufficient evidence that in the first place for them to weigh. So there is no re-weigh going on. The fact that the mother and father, that Bruce and Deborah had been in the early part of their marriage years ago in marriage counseling, unless the court's willing to sign off on an opinion that says the fact that my wife and I went to marriage counseling is evidence that we no longer have a relationship. That's a difficult thing to logically find. It depends upon the context that you're talking about. It could be. The issue is, was there some evidence of estrangement? And I think fairly you'd have to say there was some evidence of estrangement at some point during the marriage. I'm sorry, I would disagree with your Honor on that. Now we're talking just about the husband, the surviving husband, Bruce. We're talking about the husband. And we have a situation where there was no estrangement. And keeping in mind that estrangement is the only thing that occurred is that during the course of the marriage counseling, the marriage counselor, and this is early on in the marriage, and I don't want to miss this point. The unrebutted evidence was that the marriage counseling made them stronger. It healed whatever was there. If there was a wound, it was gone. But the testimony was that the marriage counselor suggested as part of the counseling process, and I know this would be the case, they suggested that the husband and wife sleep in other rooms. And the husband actually, there was the only bit of humor in the trial. He said we couldn't even quite do that because we were getting along pretty well. But the fact that two people happened to sleep in separate rooms during an argument, that almost strikes me as something that you would see in a movie comedy. That cannot, in my estimation, go to a jury to say because a husband and wife years before spent some nights in a separate bedroom, that could be evidence to overwhelm all the rest of this unrebutted testimony. And that's been a hint of all of the cases that have done what we've said. I mean, there's been some testimony in every one of these cases that we've cited that suggests that. Let me accept your argument. Tell us why it is not us basically reweighing the evidence and substituting our judgment for the jury's. How do you get around that argument? Because if we find it in your favor, we're overturning the jury's verdict, are we not? You are, just as the courts did in the cases we cited. If I could be so bold, if I was writing the opinion, I would simply say that the fact that a couple had some minor difficulties, and I don't know, that's all I can see them, early in the marriage, cannot, unless there is more to it, cannot serve to overwhelm the rest of the evidence. But the jury is entitled to give the witnesses' testimony no way to go? Absolutely. And to disbelieve them? I disagree with that. I'm sorry. I disagree with that entirely. Why is that? If I look at the Anderson case that I cited. Even though it wasn't, quote, unrebutted, the testimony itself contained some facts that the jury could have used, theoretically, to come to their conclusion. There was some evidence of disagreements, of trouble in relationships. Now, theoretically, the jury could have used that. And my response to that is, how can a jury, as a matter of law, and they may have, and that's the problem. How can a jury, as a matter of law, say the fact that the husband and wife had some disagreements earlier in the marriage, that would be sufficient to give zero? They might use it to downweigh it, but there is a presumption, the Bullard presumption, a presumption of substantial loss. Well, the Bullard presumption. Right, and it's the right to give it no way at all, according to Cooper v. CTA. But the cases that have looked at, the ones that we've cited, in particular, the Lawson Consortium case, the courts have said you can't ignore, and the Anderson case I cited to the court, the jury cannot ignore what is essentially unrebutted evidence. You can only ignore what was there if there is some inherited probability to it. Or the Snowville case, which is the Supreme Court's big discussion of exactly what we're talking about. And that's the case where the young woman was injured. She was a tennis player, and she got zero for pain and suffering. But the court said there was evidence that she'd gone back to playing tennis within days, and there was medical testimony from the other side saying she was actually fine and her damages were limited to just a couple of days. In essence, you're sort of totally mystified about the jury's verdict, and you indicated that there were some problems early in the marriage, but following counseling, things got back on track, the marriage got stronger. But just to confront you with a couple of passages here, the husband had testified that they had heated arguments that drove them to marital counseling, and they lived separate and apart for six months. We know that, and you've addressed that. However, he also then testified that the counseling brought them, quote, unquote, a little closer together. He also testified that after the counseling, they, quote, unquote, kind of committed to the marriage. Does that sound like a ringing endorsement of a close marriage? It does, if Your Honor was going to consider that with the rest of his testimony, which talks about how well they got together. And in light of the daughter's testimony, it talks about how well the family got together with the husband. I see what you're doing. You're focusing on one aspect of it to rebut that. Yes. You have the other aspect. Again, isn't that within the jury's province to assess the weight to be given to the evidence? They can assess the weight that can be given to the evidence, but our position is they can't, in this case, say there was zero. If we had gotten a low verdict, like in the Chrysler case at the defense sites, I don't think I would be here. I have to struggle with that. But to say that what Your Honor just pointed to or Justice Zinop pointed to in terms of that testimony, if that can destroy the presumption, then I'm probably going to not succeed in persuading any of you. That is such a picky, small amount, and it ignores the fact that you have the two daughters out here. Where is the alienation from the two daughters? We have three separate people, and the jurors disregarded all of that. Well, you raised two questions for me with your answer. Number one, Mr. Passau's testimony was rather explicit about missing the grandkids who were his via marriage. Very much. But that shows a close relationship with the grandkids, but how does that relate to the close relationship with his wife? I would say because what he was saying is that he misses his family. He misses his family, and his wife was part of that family. And what it shows is the nature of the relationship. This wasn't some situation where we had the estrangement that they would need to show a complete failure to have any society to lose. All the testimony was that this family got along well. It was the daughter's testimony. Not just his grandchildren, but each of the daughters said how important the mother was to the whole family. She was the rock of the family. I think he called her the matriarch of the family. There's nothing to rebut all these years of the parents. If you recall, Mr. Passau's testimony was we built this house so that we could spend our retirement together. I think that answers your question, Justice Hudson. We built this house so we could have our retirement together. I don't know how – he may not be the most Arabic man, but I'm not sure how we can say it any better than that. You can read between the lines and see what he was looking forward to. That raises my second question. Have you found any case or any authority that establishes your point that if we have these troubled years before, and we can't deny we had troubled years with the girls and a troubled time with Mr. Passau, and then things get better, is there anything, is there a bright line? We look at the last four years, the last two years. I've looked at it. I've never seen a factual situation come up that could mirror this. Although we don't know, for all I know and for all the court knows, when we read the opinions, we don't know what all the testimony was. I would suggest to the court that in most instances, most defendants wouldn't have the nerve to say that because I had a fight with my wife seven years ago, there's no loss of society today. That kind of argument in front of a jury could just blow up in your face because I don't think most human beings would accept that. I don't think they would accept the same thing as to the daughters. Keeping in mind that there's three plaintiffs, the two daughters, where was the alienation here that the two daughters, they can only live with one parent when their parents got divorced and they went with the father, each one for a few months, seven months, nine months, I think. Is that, is this court willing to write an opinion that says that's alienation? One daughter didn't come back. She went to a friend's house. Exactly. She went with the father and then she went with a friend. I mean, for a long time, for 21 or 22 years, you know, at that time, she was living with somebody outside of the family, period. Well, it's not up to us. One was living with a boyfriend. Go ahead. I'm sorry. I'm sorry. No, one was with a, one was, one got married. The other one was living with a young male. If you read, if it was read closely, that's where she was. She was in a different relationship. I'm sorry, Your Honor. You know, that brings up the question of the appropriate standard of review. Exactly. You contend that it is de novo. Is that correct? I believe this court defined it de novo. I know this court is going to be reluctant to find de novo in this situation. All the cases talk about manifest weight. But when you read the cases, it dawned on me, even though they're using the words manifest weight, they're saying that damages are legally insufficient. When somebody says, when a court says, when you would say legally insufficient, that to me rings a bell as a matter of law. But we're reviewing the order denying the motion for new trial, correct? That's right. Is that what we're doing?  And so in order to reverse a denial of a motion for new trial, we have to find what you said the verdict is contrary to the manifest weight of the evidence. So an opposite conclusion is clearly apparent. Yes. That's the way manifest weight is. That's the language. And yet it's been – I'm sorry. No, that's what you're saying. In essence, you're saying, look, the jury, when you consider the totality of all the evidence, the jury's verdict was contrary to the manifest weight of the evidence. And you're asking for a new trial on the issue of loss of society? Is that what you're saying? Yes, Your Honor. Just that was the one damage item. I have a difficulty with the other ones because they're not zero. And the other ones are accurate. The medical bills were – they paid all of our medical bills. They paid the exact funeral bills. Those are dead. It just wasn't a problem, which makes it even more of a mystery why they did it. What we're looking at, Your Honor, is – the relief I'm looking for is exactly what the court gave in Murray and Torres and Casey. Each one of those cases, the same argument could have been made. Each one of those cases, you could have said, well, the jury just didn't have to believe the plaintiffs at all. The court has taken the position. You can't disbelieve – Were they loss-of-society cases? No, they were not. That's what I thought. They were not. That type of evidence is a little different, is it not? It's more subjective. The loss-of-society case is the Casey case. That was the curious case where there was a physically injured spouse and then the loss-of-society or loss-of-consortium, they called it. I wish they would just use one term, so I would only have to remember one. They gave damages to the physically injured patient but not to the surviving – not to the spouse. And the court said, you can't do that. There is this – And they said that in that case, even though there's no presumption. In this case, the plaintiff had the benefit of the presumption of loss-of-society. That's a presumption that somebody has to destroy. This court would have to say that having marriage counseling and, in the case of the daughters, I guess, choosing to live with your father and then, in one case, getting married and in the other case with a boyfriend amounts to estrangement. And we'd also have to say the fact that it was in the past meant that even though everybody agreed in those many years before her death, it's a family relationship everybody would want, that that somehow disappeared. Counselor, you raise an interesting point. You're talking about the presumption. We recognize there is a presumption. It did establish a primary patient case for your clients. We all agree the presumption is rebuttable. So what quantum of evidence – are you aware of any cases that sets forth the quantum of evidence that has to be presented to rebut the presumption? Isn't that one of the jury's profits? The cases we rely upon are the ones I've mentioned. In each one of those cases, they found that there wasn't – that the presumption had to stand. And probably the best discussion of it is the Kidney-Anderson case where Justice Nichols, I think, wrote and explained that you can't pretty much ignore unrebutted evidence. And I suggest to the Court that what we have here is basically unrebutted evidence with these rather small, small matters. If, in this case, the jury could award zero damages and claim the presumption disappeared, there isn't a wrongful death case in the world that couldn't come back with zero damages because there isn't any of us who in their lives haven't had something, I presume, that's what happened to a patient. But you're not aware of any cases that say the presumption has to be rebutted by a preponderance of the evidence occurring. You're aware of no standard that directs the jury as to the quantum of proof, correct? I am not. I don't believe that. I don't believe that a court has written that if it hasn't escaped me. And my opposing counsel is more than competent to look at it. Mr. Rastak, I have one other question. Let's assume – well, I'm just going to talk about Mr. Passon now. They've been married about six years. He gets on the stand and he testifies, those first five years were really tough. We had all sorts of problems. That house almost killed us, blah, blah. But in this last year of her life, things have been wonderful. Are we in the same position? I mean, because we're looking at six years. If you change it so he's got like five, he's got a long span of bad things. That was my point when I first started. At that point, it's a more difficult argument for me, and yet the society you lose is the society you lose when the person dies, not the society you had 15 years ago. Unless there's some reason for the jury to disbelieve that last year, my opinion would be – I think Bullitt was deported. That's the loss of society we're looking at. We're not looking at what my health was 10 years ago. We're looking at what my health was yesterday. If I was crippled for 10 years, but in the 11th year I was healthy and I got hurt in an accident, they can't come back and say I was crippled for the prior 10 years. You look at the arrangement at the time of death. You can balance it out. The only way that that prior – that Your Honor's hypothetical could come into play is if the jurors for some reason could say we don't believe this man today because of this prior track record. That would be the argument I would make if I was a defendant, but that's obviously not the case we have. And if they don't believe – Mr. Howard, thank you. And if they don't believe that, if they don't believe Mr. Passau and each of the girls, we still have to consider a loss of society? They cannot not believe all three of these people. Their testimonies are consistent and actually interlocking. They're actually self-corroborating. Each one of these three people looked at it from a different angle and uses different words and different terminology. What you get is this picture without a crack, without a break in the picture. Thank you. We'll have time for rebuttal. Mr. Howie. May it please the Court. I am Scott Howie. I represent the defendants' affilies in this matter, Dr. Scott Glazer and pain specialists of Chicago. They are my clients. But in a larger sense, in a different sense, I represent others who have no formal counsel here, and that is the jury, the 12 good men and women who were asked to listen to the evidence, watch the witnesses testify, hear the instructions given to them without challenge, and reach a verdict on the evidence they heard. The 12 members of the jury did that. They reached a unanimous verdict and returned it. The question before this Court is not to decide what constitutes a loss of society or what defeats a loss of society claim. What's before this Court is whether the verdict the jury rendered after watching the witnesses and hearing them testify was against the manifest way of the evidence. There is not a single case that forces the jury to reward loss of society damages for a claim that it believes is not proved. And, in fact, the law is quite clear, contrary to Mr. Ratzak's remarks at the close of his argument, that the jury is entirely free to not believe subjective testimony as to non-economic damages. But this is not totally conceived within the discretion of the jury. We have the manifest weight of the evidence standard. Are you suggesting if there was no evidence of any type of estrangement the jury could still return a verdict of zero on loss of society? Is that what you're saying? If there were no evidence of estrangement, the jury would still have the option, the ability, to disbelieve the evidence. It is quite clear, the cases are clear, that the jury can ignore the evidence. But there's no evidence here. There's no indication that the jury did ignore any evidence. It may very well be the jury didn't believe the evidence. But what about his argument, the opposite side of the coin? There is a presumption that the lineal Mexican sustained some pecuniary loss. That's what the instruction says. It establishes a prima facie case for the plaintiffs, recognizing the presumption as rebuttable. So what evidence did the defense introduce to rebut that? The evidence was introduced by the plaintiffs, and the defense emphasized it, pointed to it, highlighted it in cross-examination. But the evidence was the plaintiff's own evidence, introduced primarily on direct testimony, of the difficulties that this family endured during its time as a family. Mr. Ratzak alluded to it a great deal this morning. In fact, the plaintiffs introduced it on direct, presumably in recognition that it would be damaging to their case if it were to come out on cross-examination. The evidence was, as Mr. Ratzak related, that the decedent's husband and her were estranged, in a sense, for a long period of their marriage. It wasn't just sleeping in separate rooms. Was that not early on in the marriage, though? It was early, but it wasn't just sleeping in separate rooms because they had an argument. It was six months sleeping in separate bedrooms. Could you make the arguments that the husband and the daughters were very honest and very candid because they obviously acknowledged some problems in their relationship, didn't they? The argument was made at the trial. That argument was made. Apparently, it was not enough to persuade the jury. And again, I want to stress that this Court is not sitting as a jury. It's not sitting as a body that decides, and of course it very well knows, and I'm not telling you anything you don't know, that you're not here to decide what amount of damages is appropriate. We have a decision as to what amount of damages was appropriate, and the question is whether there was evidence to support that decision. The evidence was, as the plaintiffs themselves testified, that the decedent's husband and her slept apart for a period of six months out of a total five-and-a-half-year marriage. They didn't do it just because of an argument, but because they were undergoing marital counseling. A significant omission in this record is any reference whatsoever to sexual relations, which is an unusual omission in a claim of this sort, and that's just the husband. There was also, as to the daughters, there was the evidence that they, when they had the option of choosing a parent to stay with when their parents divorced, they didn't choose the decedent. They chose to live with their father. Well, counsel, that's all early on in the girls' lives and in the middle of the marriage, let's say. But do you agree with counsel that the time that is to be looked at is the time of death to evaluate what the evidence was then as to loss of society? Of course. But that evaluation is made in context of the relationship as a whole, and it is, again, the jury making that determination with a presentation to it of all the evidence concerning what the relationship of these people was during the decedent's life. They were making a determination as to what that relationship might have been at the time of her death, but it's informed by their knowledge and the evidence that is presented to them of what that relationship was throughout the life. So there's no continued estrangement that still would warrant a verdict of no damages? It supports a verdict because it goes to the credibility of the testimony about the relationship at the time of death. This is subjective testimony. It's non-economic damages, and the cases are legion that hold that the plaintiff, I'm sorry, the jury can choose to disbelieve subjective testimony about non-economic damages. It can especially disbelieve that testimony if its impression of the testimony is that it's not credible based upon the other testimony given about the rest of the relationship. If, for example, and it happened in this case, if the jury heard evidence that there were difficulties through the earlier years of the marriage or the childhood and the teenage years of the daughters, if it heard evidence about that and then heard the plaintiffs testify that everything was peachy keen and hunky-dory at the time that the decedent died, it may have found that evidence unbelievable, not credible, not consistent with the rest of the evidence that it heard. And that's a decision that is for the jury to make. So you're arguing in essence it's not a complicated case. The jury heard all the evidence, they were properly instructed, instructed under the laws up to them the way the credibility and the weight, and they arrived at a point. That's correct. And they did that within the confines of what the jury system asks them to do, demands them to do, in fact, in the parlance of jury demands, and did it to the best of their ability. The evidence that was presented to them allowed them to reach a conclusion that there was not any society between these people. That may be a difficult decision for this court to accept. It may be hard to think that there are families like that. It's a hard decision for a jury to reach. But we call upon juries to make hard decisions. In cases like this, we ask them to evaluate, we demand, in fact, that they evaluate the relationship of people who come before them to prove that relationship. And if they don't find that relationship to have been proved, if they don't believe the evidence that the relationship was all sweetness and light at the time that the decedent died, there is no case in Illinois that requires them to award damages for loss of society. The very case, the Supreme Court case that Mr. Ratzak alluded to this morning, the Snover case, specifically holds that in cases where the plaintiff's evidence of injury is primarily subjective in nature and unaccompanied by objective symptoms, the jury may choose to disbelieve the plaintiff's testimony as to pain. That's a pain and suffering case. The non-economic damage at issue was pain and suffering in Snover. But the appellate court, other districts of this court, have found the same conclusion as to other forms of non-economic damages. It was disability in the Butkovitz case. It was disability and loss of normal life in the Palinchik case. And in the Chrysler v. Darnell case, it was loss of society, where the court specifically held that the jury was entitled to award zero damages to a daughter of the decedent, the adult daughter, in a very remarkably similar situation to the facts of this case. That was a daughter who testified to enjoying a warm and loving relationship with her father throughout his life, throughout her life. And although she had moved out of state, she still continued to talk to him frequently, visited him when she was able to, testified that she was always able to rely on him for help and support. That is almost verbatim, very close to what the daughters testified in this case, very similar to what the wife testified in this case. In that case, the daughter was awarded nothing, and the appellate court found that to be consistent with the manifest weight of the evidence. I'm sure that was a hard decision, both for the jury in that case and for the appellate court that had to approve it. But these are hard decisions that we call upon our juries to make, demand, in fact, that they make. And in the situation of deciding what a family relationship was and what sort of compensation it might award, I'm sure that the decision may be hard. But those are the decisions that we call upon our juries to make. Particularly in the family context, that can be a difficult verdict to award. Loss of society is a very subjective position as opposed to pain and suffering, maybe, and some other things that we can measure in some way. I mean, doctors say, okay, as you come into my office today, what's your pain, 1 through 10? You know, they've developed a system. This is not such an easy thing to deal with. So how do we tell juries, and maybe this is not our position or our job right now, but how do we tell juries that you have to look, you have to watch if there's a presumption. They may not know these things. And there was six years of evidence of relationship between Mr. and Mrs. Passau and 20-plus years of relationship between the daughters and Mrs. Passau. We ask the jury to apply the exact standard that juries are designed for, to apply their life experiences, to evaluate the evidence presented to them and put to it or apply to it their own experiences, their own background and life experiences that they bring to all aspects of the factual determinations they're called upon to make. Jurors are very carefully selected. That's always, as the Court is well aware, a very important part of a trial. They're very carefully selected by both parties to be a body of people who are appropriately suited, hopefully, to address these questions. The nature of loss of society certainly is different from pain and suffering, but it is similar to it in the respect that it is a non-economic damage, the sort of damage that the courts have repeatedly referred to as something that is not just non-economic but subjective, intangible, the sorts of things that are particularly suited to the life experiences of a jury and evaluate, the sorts of things that can only be testified to, can only be evidenced in some respects, by the subjective complaints or subjective testimony of the plaintiffs. And it is a uniquely jury function to evaluate the credibility of that testimony in the context of their life experiences but also in the context of the evidence presented to them. All the evidence concerning the relationships among these people, warts and all, estrangements, living apart, family difficulties, marital arguments, all of those things get bound up into the decision the jury is called upon to make. And if the jury decides that it doesn't find the deathbed argument or the deathbed expressions of a close relationship to be credible in the light of all that other testimony, then that is the jury's decision to make. These can be particularly difficult questions to answer and difficult verdicts to render in the context of a family situation. They can be especially difficult to evaluate on review in the family situation. All happy families are alike, it's been written. Every unhappy family is unhappy in its own way. Hopefully we are all fortunate enough to come from happy families that, as someone said, are all alike. But the different family dynamics that juries are called upon to evaluate in cases like this call for a special deference to the jury. And the standard review for this case, as Your Honor alluded to, is very clearly a manifest weight standard. To consider it a de novo standard is to ignore the wealth of cases, many of them cited in our brief, that describe the deference to be given to the jury. The Snower case that Counselor referred to is just one of them. The cases I referred to today, Budkovitz and Poliček and Chrysler, are all cases of a kind with that. This was a jury question answered by the jury, a jury that was asked to do a job and did it to the best of its ability and with no apparent ignoring of any evidence. If it chose to render a verdict that was contrary, very considerably contrary, in fact, to the argument of the plaintiff, it did so because it didn't believe the evidence. There is no indication it ignored anything. And this Court should give proper deference to the decision of the fact finder in this case, a jury of 12 good people, to do its job. Is there a definition available to the jury of this presumption of loss, of significant loss? I mean, not a dollar amount, obviously, but do they know what that means? Do they know what that meant here? I believe, and I don't have the jury instruction in front of me. It wasn't an instruction that was at issue or in dispute. But I believe the instruction tells the jury that the plaintiffs are presumed to have suffered some loss. That, of course, as we discussed this morning, is a rebuttable presumption and a presumption which, as cases have held one after another, that the jury is not required to give any weight to whatsoever. That's, in fact, implicit in the concept of weighing the evidence, the courts say, is the notion that the jury is free to give it no weight at all. That's implicit, not explicit, in the jury instruction, correct? That's correct. It is implicit. The jury instruction does have some instruction about it determining the loss, what factors the jury may consider, however. I believe there's a long list of factors. Right. I'd be happy to address any other questions the Court might have.  Thank you, Your Honor. Counsel said no case required there be a loss of society. The Casey case I cited to you earlier, the loss of the injury and then the loss of consortium, that court required a reward of a loss of society, even if not a death case. The only case that's ever come out that's allowed zero for loss of society is part of that Chrysler case that counsel talked about. That was the case in which the facts were very unusual. The evidence was that the person who died as a result of the medical malpractice was going to die in any way of other causes. I think the opinion said pretty much at the same time. They gave the surviving wife a small award. They gave the daughter zero, but the daughter had sort of proved my point. The daughter had moved out of state to Arizona for five years before this. They'd only seen her father twice. And the court's premise was that the jury did have to treat the mother and the daughter the same. But the case that the court cited there, the Finley case, they got it wrong. The Finley case is a sibling case, not a lineal descendant case, so the authority that they had for that was wrong. But the bottom line is I think the court there just looked at a situation where there simply wasn't a loss. That's not what this court has before. Counsel would have to admit that what this jury had to look to was at the time of death. All the evidence was at the time of death. All three of these people had a close relationship. The instruction said you have to presume that they sustained some substantial pecuniary loss. We simply submit that can't be zero. Not where Bruce Passau testified. It's at page 150, I think, that after all that was said and done after their counseling, he said it worked out well. And that was on your budget. Unless your honors have some further questions for me, we've said most of what we had to say in our briefs. Thank you. Thank you very much. Thank you, gentlemen, for the argument this morning. We will take this case under advisement. We will give you a decision in due course.